**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**McALLEN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | 7:18-CR-0855-2 |
| § | |
| MEISY ANGELICA ZAMORA § | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO REVOKE OR AMEND**
**DETENTION ORDER PURSUANT TO 18 U.S.C. § 3145(B)**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, MEISY ANGELICA ZAMORA, Defendant, by and through her undersigned counsel Christopher Sully, and respectfully files this memorandum in support of her Motion to Revoke or Amend Detention Order, based on the transcripts that have been filed of the testimony at her detention hearing, as they pertain to the detention/release factors, especially the relative lack of evidence against Mrs. Zamora to support the charges against her or to support the government's allegations of risk of flight:

Even though Mrs. Zamora is charged with health-care fraud, she is not even alleged to have been involved in misdiagnosing or overtreatment of patients or fraudulent billing. She was not examining, diagnosing, prescribing, or otherwise involved in the practice of medicine at the clinics. Tr. 8/1/18 at 27-28, 79-80. She would even refuse to talk to patients if they tried to talk to her. Tr. 8/1/18 at 28. There is no information to show that she was even communicating with patients. Tr. 8/1/18 at 29.

Instead, Mrs. Zamora's role at the clinics was primarily to oversee the entities that owned the properties where the medical clinics were located and the entities that purchased and owned the medical equipment used by the medical practices. Tr. 8/1/18 at 26-27. Initially, the government mischaracterized Mrs. Zamora's testimony from a bankruptcy proceeding to claim that she always

1

had such an active role in the clinics, but on cross-examination, the agent conceded that this was only as of early 2017, which is very late in the timeframe of the alleged conspiracy. Tr. 8/1/18 at 38, 92-95.

As to alleged fraudulent billing, she is not alleged to have been involved in that, either. She was not entering billing codes. Tr. 8/1/18 at 29. No one claims that she told anyone to change billing codes or use them in a certain way, nor that she trained or instructed anyone on how to bill. Tr. 8/1/18 at 29. Instead, it would have been someone else—the billing supervisor—who did that. Tr. 8/1/18 at 29-30. More importantly, Mrs. Zamora never falsified billing codes nor told anyone else to do so. Tr. 8/1/18 at 39, 41.

While the government alleges that Mrs. Zamora was somehow involved in fabricating or falsifying records in response to grand jury subpoenas, there is no evidence to back up that allegation. While one person—disgruntled, fired ex-employee Raymundo Moreno—claims that she was somehow involved in the records production, the government could not identify anyone who ever allegedly saw her even go into the storage shed or "barn" where the records where located. Tr. 8/1/18 at 31, 39-40. The only "evidence" of Mrs. Zamora somehow falsifying or fabricating records is Mr. Moreno's claim that on just one occasion he saw Mrs. Zamora with an unnamed lab technician. Tr. 8/1/18 at 31. Without anything further, Mr. Moreno assumed that because of this she was somehow working with the lab technician to create missing reports. Tr. 8/1/18 at 32. However, he never saw her create any missing records. Tr. 8/1/18 at 32. It is unknown how far Mr. Moreno was from Mrs. Zamora when he allegedly saw her with the lab technician or whether he could see what, if anything, they were doing. Tr. 8/1/18 at 32. He did not even know what, if anything, Mrs. Zamora was talking about with the lab technician, so he apparently was not close enough to even hear. Tr. 8/1/18 at 82. The testifying agent did not bother to interview

the lab technician to try to follow up on Mr. Moreno's vague claim; indeed, it is unknown if anyone did. Tr. 8/1/18 at 33.

Even though the government listed six employees in the criminal complaint and interviewed several other employees, Raymundo Moreno seems to be the only person who remotely accuses Mrs. Zamora of any criminal activity (as opposed to personality complaints like some other employees seemed to make). No one else indicated that Mrs. Zamora was involved in any alleged scheme. *See, e.g.,* Tr. 8/1/18 at 50, 52-53.

Raymundo Moreno was a medical assistant at the medical practices from 2011 to 2017. Tr. 8/1/18 at 44. Therefore, he would be able to provide no information as Mrs. Zamora before then, even though the government is alleging that she was involved in a health-care fraud conspiracy dating back to 2000. Likewise, even though the government is alleging that Mrs. Zamora was also involved in a conspiracy to obstruct grand jury subpoenas into 2018, Mr. Moreno was fired in 2017 and would therefore not be able to provide any information as to Mrs. Zamora after that.

Even though Mr. Moreno admitted that he was the one who falsified diagnoses or codes and had the biller change the diagnosis, without any alleged involvement by Mrs. Zamora, the government has taken no action against him, and instead seems to have rewarded him with immunity from prosecution in return for claiming that Mrs. Zamora was involved in falsifying records because he saw her with a lab technician on one occasion at some unspecified time. *See* Tr. 8/1/18 at 45-46, 31-32, 87. This, even though Mr. Moreno initially lied to agents (a separate prosecutable crime), only to later change his story and testify to the grand jury that he was actually the one who had falsified records and codes. Tr. 8/1/18 at 46-47. Ironically, by lying to the agents in their investigation, Mr. Moreno was also obstructing the ongoing grand jury investigation, which is a crime with which the government, in its perverse sense of justice, has chosen to charge Mrs. Zamora, instead of Mr. Moreno. This, even though Mr. Moreno eventually admitted that he

3

falsified codes and records himself without Mrs. Zamora's involvement; indeed, he was never advised by Mrs. Zamora to change any billing codes. Tr. 8/1/18 at 47-48. Likewise, there is no information from him or anyone else to indicate that Mrs. Zamora ever told anyone to fabricate or falsify records. Tr. 8/1/18 at 86-87. For instance, he indicated that she was not even involved with X-rays, much less with falsifying or fabricating them. Tr. 8/1/18 at 87. Even though a search warrant was executed in 2017, after the grand jury subpoena requests began to be made, those searches yielded no identifiable evidence against Mrs. Zamora, either. Tr. 8/1/18 at 89.

Even though the government seems to claim that the fraud amount in this case was about a quarter of a billion dollars and that Mrs. Zamora's sentence would therefore be at the statutory maximum, the government has not been able to even estimate what number or percentage of the total claims by the clinic was allegedly fraudulent, much less in how many of those Mrs. Zamora was allegedly involved, if any. Tr. 8/1/18 at 63, 68-69. The agent was only able to identify three patients that he believes were misdiagnosed by Dr. Jorge Zamora, Mrs. Zamora's husband. Tr. 8/1/18 at 67.

An FBI accountant testified as to alleged wire transfers to Mexico, but conceded that neither Mrs. Zamora nor her husband conducted those transactions. Tr. 8/1/18 at 123-24. More importantly, the government has been unable to say whether Mrs. Zamora has any funds or property available to her at this time or at the time of her detention hearing. Tr. 8/1/18 at 127-28.

There is no evidence that Mrs. Zamora ever attempted to flee prosecution, and there is no statement by her that she ever intended to do so. Even though she allegedly traveled to Mexico on at least two occasions, she always returned home to the same residence in Mission, Texas, where she has lived for the past two decades, even after grand jury subpoenas were issued and her husband was arrested. Tr. 8/1/18 at 112-14. And after that, she came to court once again, where she was arrested.

Therefore, there are several conditions and combinations of conditions that can reasonably assure her appearance at future court proceedings. *See, e.g.,* 18 U.S.C. § 3145(c)(1)(B)(i-ix), (xi-xii), (xiv). Accordingly, now that the requested transcripts have been filed, Mrs. Zamora respectfully requests another hearing on this motion, pursuant to 18 U.S.C. § 3145(a), and that she be released pending trial on reasonable conditions.

                                                Respectfully submitted,

                                                *s/Christopher Sully*
                                                CHRISTOPHER SULLY
Attorney-in-Charge
Counsel for Meisy Angelica Zamora
Southern District of Texas 1119552
Texas State Bar No. 24072377
LAW OFFICE OF CHRIS SULLY
5804 N. 23rd St.
McAllen, TX 78504
Tel.: (956) 413-7271
Fax: (888) 990-1525
csully@sullylaw.com

**CERTIFICATE OF SERVICE**

On September 17, 2018, this memorandum was served on Assistant U.S. Attorney Andrew Swartz and on all other counsel of record via ECF.

                                                *s/Christopher Sully*
                                                CHRISTOPHER SULLY